IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| TRANSMETA CORPORATION, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | C.A. No. 06-633 (GMS) |
| | ) | |
| | ) | **REDACTED** |
| | ) | **PUBLIC VERSION** |
| INTEL CORPORATION, | ) | |
| | ) | |
| Defendant. | ) | |

## TRANSMETA CORPORATION'S ANSWERING BRIEF IN OPPOSITION TO INTEL CORPORATION'S MOTION TO STAY THIS ACTION PENDING REEXAMINATION OF TRANSMETA'S PATENTS IN SUIT

Jack B. Blumenfeld (#1014)
Karen Jacobs Louden (#2881)
Richard J. Bauer (#4828)
MORRIS, NICHOLS, ARSHT & TUNNELL LLP
1201 North Market Street
P.O. Box 1347
Wilmington, DE 19899-1347
(302) 658-9200
klouden@mnat.com
*Attorneys for plaintiff Transmeta Corporation*

OF COUNSEL:
Robert C. Morgan
ROPES & GRAY LLP
1211 Avenue of the Americas
New York, NY 10036-8704
(212) 596-9000

Norman H. Beamer
Gabrielle Higgins
ROPES & GRAY LLP
525 University Avenue
Palo Alto, CA 94301
(650) 617-4000

John O'Hara Horsley
TRANSMETA CORPORATION
3990 Freedom Circle
Santa Clara, CA 95054
(408) 919-3000

Original Filing Date: August 17, 2007
Redacted Filing Date: August 20, 2007

# TABLE OF CONTENTS

**Page**

INTRODUCTION ...................................................................................................1

NATURE AND STAGE OF THE PROCEEDING...............................................3

SUMMARY OF ARGUMENT .............................................................................4

STATEMENT OF FACTS .....................................................................................6

    A.    Transmeta's Business ...........................................................................6

    B.    Transmeta's Patent Portfolio ...............................................................8

        1.    The '061 Patent ........................................................................8

        2.    The Speculative Address Translation Patents ..........................9

        3.    The Instruction Scheduling and Multiple Typed Register
            Patents ......................................................................................9

    C.    Transmeta's Licensees .......................................................................10

    D.    This Motion Is Part Of Intel's Years-Long Effort To Fend Off
        Transmeta ...........................................................................................11

        1.    Transmeta's Initial Success Was Stalled By Intel's Market
            Manipulations.........................................................................11

        2.    █████████████████████████████████████
            ████████████████████.............................13

        3.    A Stay Would Severely Threaten Transmeta's Chances For
            Survival ...................................................................................15

    E.    Intel Knew About The Patents In Suit And The Reexamination Prior
        Art Long Before It Requested The Reexaminations................................17

    F.    The Reexaminations Will Take Many Years To Complete....................18

        1.    Ex Parte Reexamination Proceedings Take Years to Complete ...................19

        2.    Inter Partes Reexaminations Are Seriously Backlogged .............................21

ARGUMENT...........................................................................................................22

    A.    A Lengthy Stay Would Unduly Prejudice Transmeta — Transmeta's
        Very Survival Is At Stake ...................................................................23

        1.    Undue Prejudice Is The Most Important Factor To Be
            Considered ..............................................................................23

        2.    The Reexamination Proceedings Are Likely To Entail
            Significant Delay.....................................................................24

3.    The Likely Delay Would Threaten Transmeta's Very Existence ..................27

B.    Intel Filed This Motion Solely For Tactical Advantage ..........................................27

C.    Proceeding With This Litigation Would Not Waste The Court's Resources, And A Stay Would Not Significantly Simplify The Issues .................29

1.    It Is Unlikely That The Reexaminations Will Significantly Simplify This Case ........................................................................................29

2.    This Litigation Will Likely Be Completed Before The Reexaminations ........................................................................................33

D.    The Discovery And Trial Schedule Does Not Justify A Stay ................................35

E.    There Is No "Strong Public Policy" Or "Liberal Policy" Favoring Stay ................................................................................................................35

CONCLUSION ........................................................................................................................38

# TABLE OF AUTHORITIES

**Page(s)**

## FEDERAL CASES

*Abbott Diabetes Care, Inc. v. Dexcom, Inc.*, No. 05-590, 2006 WL 2375035
(D. Del. Aug. 16, 2006) ........................................................................................22

*Akzenta Paneele + Profile GmbH v. Unilin Flooring N.C. LLC*,
464 F. Supp. 2d 481 (D. Md. 2006) .............................................................24, 32

*Alltech, Inc. v. Cenzone Tech Inc.*, No. 06-153, 2007 WL 935516
(S.D. Cal. Mar. 21, 2007) .............................................................................26, 28

*Amersham Int'l v. Corning Glass Works*, 108 F.R.D. 71 (D. Mass 1985) .........................24, 25, 35

*ArthroCare Corp. v. Smith & Nephew, Inc.*, No. 01-504 (D. Del. Nov. 27, 2002) ........................31

*ASCII Corp. v. STD Entm't USA, Inc.*, 844 F. Supp. 1378 (N.D. Cal. 1994) ................................36

*Biax Corp. v. Fujitsu Computer Sys. Corp.,* No. 06-364, 2007 WL 614187
(E.D. Tex. Feb. 26, 2007)..............................................................................26, 35

*Cheng v. Sighting Sys. Instruments*, No. 06-2326, 2007 WL 1341119
(N.D. Ga. May 3, 2007)........................................................................................35

*Cognex Corp. v. Nat'l Instruments Corp.,* No. 00-442 (JJF),
2001 U.S. Dist. LEXIS 25555 (D. Del. June 29, 2001) ...................................22, 23, 25, 28

*Ecolab, Inc. v. FMC Corp.*, No. 05-831, 2007 WL 1582677
(D. Minn. May 30, 2007) ...............................................................................32, 34

*Emhart Indus. v. Sankyo Seiki Mfg. Co.*, 3 U.S.P.Q.2d 1889
(N.D. Ill. 1987)....................................................................................................35

*Ethicon, Inc. v. Quigg*, 849 F.2d 1422 (Fed. Cir. 1988).............................................22, 23, 31, 34

*Gould v. Control Laser Corp.*, 705 F.2d 1340 (Fed. Cir. 1983) ....................................................36

*Guthy-Renker Fitness, LLC v. Icon Health & Fitness, Inc.*, 48 U.S.P.Q.2d 1058
(C.D. Cal. July 15, 1998) ....................................................................................36

*Hoechst Celanese Corp. v. BP Chems. Ltd.*, 78 F.3d 1575 (Fed. Cir. 1996) ................................30

*Imax Corp. v. In-Three, Inc.*, 385 F. Supp. 2d 1030 (C.D. Cal. 2005)................................24, 25, 35

*In re Am. Acad. of Sci. Tech. Ctr.*, 367 F.3d 1359 (Fed. Cir. 2004)..........................................20, 33

*In re Etter*, 756 F.2d 852 (Fed. Cir. 1985) ...................................................................................33

*In re Yamamoto*, 740 F.2d 1569, 222 U.S.P.Q. 934 (Fed. Cir. 1984) ...........................................32

*Landis v. N. Am. Co.*, 299 U.S. 248 (1936)............................................................................. *passim*

*Lectrolarm Custom Servs., Inc. v. Vicon Indus., Inc.*, No. 03-2330,
    2005 WL 2175436 (W.D. Tenn. Sept. 1, 2005) ...........................................................28, 30

*Lexington Lasercomb I.P.A.G. v. GMR Prods., Inc.*, 442 F. Supp. 2d 1277
    (S.D. Fla. 2006) ...........................................................................................................26

*Merck & Co. v. Apotex, Inc.*, 488 F. Supp. 2d 418 (D. Del. 2007) ...................................................1

*Microunity Sys. Eng'g, Inc. v. Dell, Inc.*, No. 02-04-120
    (E.D. Tex. Aug. 15, 2005) ...........................................................................................26

*NTP, Inc. v. Research in Motion, Ltd.*, 397 F. Supp. 2d 785 (E.D. Va. 2005)..........................24, 25

*Output Tech. Corp. v. Dataproducts Corp.*, 22 U.S.P.Q.2d 1072
    (W.D. Wash. 1991) ............................................................................................24, 25, 34

*Pegasus Dev. Corp. v. DirecTV, Inc.*, No. 00-1020, 2003 WL 21105073
    (D. Del. May 14, 2003) ...............................................................................................35

*PureChoice, Inc. v. Honeywell Int'l, Inc.*, No. 06-244, 2007 WL 1189844
    (E.D. Tex. April 20, 2007) ................................................................................ 31-32, 35

*Quantum Corp. v. Rodime, PLC*, 65 F.3d 1677 (Fed. Cir. 1995)....................................................31

*Remington Arms Co. v. Modern Muzzleloading, Inc.*, No. 97-0660,
    1998 WL 1037920 (M.D.N.C. Dec. 17, 1998).............................................................24, 28

*Soverain Software LLC v. Amazon.com*, 356 F. Supp. 2d 660
    (E.D. Tex. 2005) ....................................................................................................26, 32

*St.-Gobain Performance Plastics Corp. v. Advanced Flexible Composites, Inc.*,
    436 F. Supp. 2d 252 (D. Mass. 2006)..................................................................................24

*Telemac Corp. v. Teledigital, Inc.*, 450 F. Supp. 2d 1107 (N.D. Cal. 2006)..................................35

*Unidisco, Inc. v. Schattner*, 210 U.S.P.Q. 622 (D. Md. 1981) ......................................................24

*Viskase Corp. v. Am. Nat'l Can Co.*, 261 F.3d 1316 (Fed. Cir. 2001)...........................................22

*Xerox Corp. v. 3Com Corp.*, 69 F. Supp. 2d 404 (W.D.N.Y. 1999) ..................................25, 33, 34

## FEDERAL STATUTES

35 U.S.C. § 282  ...........................................................................................................................33

35 U.S.C. § 305 ......................................................................................................................18, 31

35 U.S.C. § 314(a) ........................................................................................................................31

35 U.S.C. § 314(c) ........................................................................................................................18

35 U.S.C. § 315  ............................................................................................................................25

35 U.S.C. § 317(b) ........................................................................................................................34

35 U.S.C. § 318 .............................................................................................................................37

## OTHER AUTHORITIES

H.R. Rep. No. 96-1307(I), (1980), *reprinted in* 1980 U.S.C.C.A.N. 6460, 6463,
    1980 WL 12929.......................................................................................................................36

H.R. Rep. No. 106-287, at 33 (1999) ...........................................................................................37

## TABLE OF ABBREVIATIONS

| | |
|---|---|
| D.I. _ | Docket Index |
| Beamer ¶ _ | Declaration of Norman H. Beamer submitted herewith |
| Beamer Exh. _ | Exhibits attached to the Declaration of Norman H. Beamer |
| Belgard ¶ _ | Declaration of Richard Belgard, submitted herewith |
| Crudele ¶ _ | Declaration of Lester Crudele, submitted herewith |
| Horsley ¶ _ | Declaration of John O'Hara Horsley submitted herewith |
| Horsley Exh. _ | Exhibits attached to the Declaration of John O'Hara Horsley |
| Nguyen ¶ _ | Declaration of Le Trong Nguyen, submitted herewith |

## INTRODUCTION

A stay of this action would cause "undue prejudice" — indeed, extreme prejudice — to Transmeta. A stay would threaten the company's very survival. It could result in a win for Intel by default and would take from Transmeta its last hope for fair compensation for its pioneering intellectual property that Intel has appropriated. The stay Intel requests is not a routine plea for judicial efficiency and expedience. Efficiency and expedience fade as goals when the survival of a viable business is at stake. In contrast to the extreme prejudice to Transmeta, Intel, a multi-billion dollar company, can easily shoulder the burdens of litigation.

A stay pending the completion of the eleven reexamination proceedings that Intel started for all of the patents in suit would last for years. Intel's three *inter partes* reexaminations will be mired in a process that is completely bogged down. Of the 280 requests initiated since 1999 (when the *inter partes* reexamination procedure began), ***only nine reexamination certificates have issued*** (four by ***default***). Intel's *ex parte* reexaminations will also take years to complete. A delay of the litigation for so many years would be far more than a "business disadvantage" for Transmeta. *Cf., Merck & Co. v. Apotex, Inc.*, 488 F. Supp. 2d 418, 428 (D. Del. 2007) ("Not every business disadvantage is appropriately deemed legal injury"). And unlike in *Merck*, the Court's hands are not tied here. *Id.* Transmeta should get its day in court next year as already set by this Court, and not have to wait for years to go to trial. Otherwise, Intel may win this dispute simply by delay.

There is no public policy favoring staying federal court litigation pending Patent Office reexaminations. As this Court observed at the April 4, 2007 conference (D.I. 26 at 23):

> [Since] the days of Jefferson . . . lawyers and parties ask juries to decide of times very difficult matters . . . In the overall scheme of things, when thinking about justice and the expertise that you will inject this lay jury and this lay Court, both of you, with, I am not so sure that I agree that the PTO is a better place.

1

Intel filed this motion for tactical advantage in litigation.  This is clear from the fact that Intel has known about the patent families comprising ten of the eleven patents in suit for *years*.[1]  During that time, Intel not only recognized that these patents apply to its products, but even ███████████████████████████  It had every incentive to seek reexamination long ago.  Intel also knew for years about most of the prior art on which it relies in the reexaminations.  But Intel did not even start requesting reexaminations until five months after this action was filed.

Intel's motion is its latest move in a seven-year effort to destroy Transmeta.  By 2001, Transmeta had introduced its pioneering first product, the "Crusoe" microprocessor, to much industry acclaim, including prestigious "Best of Show" awards.  Crusoe was adopted by nearly every major Japanese notebook computer manufacturer.  Intel then embarked on a program of aggressive and predatory business tactics to stop Transmeta's Japanese customers from buying Transmeta's products.  Intel's actions ultimately led to sanctions from the Japanese Fair Trade Commission, which Intel did not contest.  Unfortunately, this intervention came too late to undo the damage to Transmeta that Intel had already done.

████████████████████████████████████████
████████████████████████████████████
████████████████████████████████████████████
██████████████████████████████████████
███████████████████████████████

---

[1]    Intel has known of the eleventh patent since it issued in August 2006, and ████████████
████████████████████

██████████████████████████████████ Transmeta turned to this litigation as a path to survival and recovery of fair value for Intel's use of Transmeta's patented technology. Intel's assertion that Transmeta unduly delayed bringing this action is ironic, given Intel's effort ████████████████████████████

Intel already has forced Transmeta out of the microprocessor manufacturing business.  Now, Transmeta hopes to preserve a home for a core group of talented engineers and support staff so that they can continue to develop and license Transmeta's pioneering microprocessor technology.  As Transmeta has announced to its shareholders, however, its ability to continue as a going concern even under these reduced circumstances hinges on raising additional investment funds.  A stay of this action would cripple those efforts.  Transmeta cannot continue as a going concern with its technology development and business model without the practical ability to enforce its patents.

To justify a stay, Intel must show a "clear case of hardship or inequity in being required to go forward, if there is even a fair possibility that the stay for which he prays will work damage to some one else," and such a stay must be "not immoderate in extent and not oppressive in its consequences."  *Landis v. N. Am. Co.*, 299 U.S. 248, 255-56 (1936).  Given the significant risk to Transmeta, staying this case for many years on the basis that the Patent Office may ultimately decide some of the issues before the Court would be contrary to *Landis*.

## NATURE AND STAGE OF THE PROCEEDING

████████████████████████████████████████

████████████████████████████████ Transmeta filed this lawsuit on October 11, 2006, asserting ten of its patents (D.I. 1).  On December 12, 2006, Transmeta amended its complaint to add an additional patent (D.I. 9).  On January 9, 2007, Intel filed an

answer and counterclaim asserting noninfringement, invalidity and unenforceability of the

Transmeta patents, and asserting counterclaims of infringement of seven Intel patents (D.I. 12).

Discovery in the action is well underway.  Transmeta has provided detailed

responses to 22 interrogatories, Intel has responded to 26 interrogatories, and the parties have

agreed to supplement contention interrogatories by August 23.  Transmeta has produced over

305,000 pages of documents, Intel has produced over 1.5 million pages of documents, and both

parties have made hundreds of millions of lines of source code available for inspection.

Transmeta has cleared its expert consultants under the protective order and commenced

inspection of Intel's code.  Intel has served 39 third party subpoenas, including on the inventors

and prosecuting attorneys of the Transmeta patents in suit, and about 115,000 pages of

documents have been produced in response to those subpoenas, with privilege logs.  Transmeta

has served seven third-party subpoenas.  (Beamer ¶ 2).

Claim construction briefing begins on October 19, 2007, with the claim

construction hearing set for December 18, 2007.  Fact discovery closes February 1, 2008, and

trial is set for December 1, 2008.

Intel submitted its first request for reexamination on March 16, 2007 — five

months after this lawsuit was filed.[2]  (D.I. 39 at 3).  Intel took three more months to request the

remaining reexaminations and file this motion.  Six of the eleven reexamination requests have

been granted, and they are at the earliest stages of the process.  (Beamer ¶ 3).

## SUMMARY OF ARGUMENT

A stay of this action pending the final outcome of the eleven reexamination

proceedings Intel initiated would essentially end this action for Transmeta.  At the April 4, 2007

---

[2]     That first request was defective and had to be resubmitted (Beamer ¶ 3).

conference, the Court asked "Why isn't speedier justice a better thing than delayed justice?" (D.I. 26 at 22). The Supreme Court in *Landis* confirmed that speedier justice is better. Indeed, a years-long stay is not so much justice delayed as it is justice denied. A multi-year stay would jeopardize Transmeta's very existence — the ultimate undue prejudice.[3]

   Intel's motion is simply a delay tactic. Intel could have requested these reexaminations on all but one of the eleven Transmeta patents when it learned of them years ago. Even as to the remaining patent, it waited six months after it issued ██████ ███ to make its request. Intel also has known about most of the principal prior art on which it relies for years. Yet Intel waited five months after this litigation was filed before it even started to request the eleven reexaminations.

   In addition, discovery in this action is well underway, trial is scheduled for December 2008, and a final judgment will likely be entered before the reexaminations are completed. In the unlikely event that any of the reexaminations is completed prior to trial, the issues of this case would not be significantly simplified. It is likely that at least some claims will be confirmed in a given reexamination, and certainly for a given family of the patents in suit. As is typical for the claims of a patent family, there is significant overlap among the claim construction issues, infringement issues, and invalidity issues raised by those claims. Any amended claims that issue can only be narrower claims — leading perhaps to additional claim limitation issues, but not reducing the number of issues. Furthermore, the patentability and claim construction standards of the Patent Office are significantly different from those in district court, limiting the applicability of reexamination findings here.

---

[3] Intel's assertion that recovery under Transmeta's patents can go to some future group of bankruptcy trustees is no answer (*see* D.I. 26 at 8). Plainly Transmeta's demise would be extremely prejudicial to Transmeta, its employees and its investors.

**STATEMENT OF FACTS**

A.    **Transmeta's Business**

Transmeta pioneered the push toward inexpensive, energy-efficient microprocessors used in today's mobile computing devices.  Transmeta was founded in 1995 with the mission of developing a new software-based microprocessor designed for highly efficient computing.  Transmeta worked in relative secrecy until January of 2000, when it unveiled its revolutionary Crusoe microprocessor, generating substantial public interest and extensive media coverage in both industry and general news publications.  With the Crusoe, Transmeta entered the x86-compatible market, which Intel had dominated since the early 1980's, when IBM adopted Intel's 8086 microprocessor for its "IBM-PC" product. [4]  (Horsley ¶¶ 6-8, 10; Horsley Exhs. 1-6).

Transmeta's microprocessors are unique.  Unlike traditional microprocessors that are built entirely with silicon hardware, they integrate software and silicon hardware components in one device.  Transmeta's software component, which is called CodeMorphing software, dynamically translates the ones and zeros of software instructions into a functionally equivalent but simpler set of ones and zeros for decoding and execution by the silicon hardware component.  CodeMorphing software also continuously "learns" about the programs run by a user and re-optimizes program execution for higher performance and reduced power usage.  The silicon hardware component is a semiconductor chip with a relatively simple internal design, primarily optimized for speed and power efficiency.  In Transmeta's processors, complex control and instruction scheduling functions, which are normally performed in silicon hardware, are instead

---

[4]        References to "x86" are to the Intel architecture that utilized the x86 instruction set and was embodied in a series of Intel processors designated 8086, 80186, etc. (Horsley ¶ 8).

handled by CodeMorphing software. By moving these functions from hardware into software, Transmeta was able to design and produce innovative microprocessor devices with fewer logic transistors, smaller die sizes, greater integration capacity, greater computing efficiency, and substantial reductions in power consumption, waste heat generation, and system cooling requirements. (Horsley ¶ 6).

Unlike the Intel microprocessors available at the time, the Transmeta Crusoe microprocessor was designed and promoted for its computing and energy efficiency, and was ideally suited for mobile computers and other computing applications that required low power consumption and thermal efficiency. In addition to the design advantages inherent in its software-based architecture, the Crusoe microprocessor featured an innovative adaptive power control technology that Transmeta called LongRun and claimed in the '061 patent in suit. Transmeta's LongRun technology increased the computing efficiency and reduced the power consumption of the Crusoe microprocessor, which enabled significant increases in the battery life of notebook computers. (Horsley ¶ 9).

Shortly after announcing its new technology, Transmeta went public in November 2000, raising $273 million in its initial public offering. By 2001, Transmeta had over 440 employees at its Santa Clara, California headquarters and throughout the world. More than 300 of its employees were engaged in research and development. In October 2003, Transmeta introduced its second product, the Efficeon processor. That was a redesigned version of the company's unique "code morphing" architecture. The Efficeon increased the performance range of Crusoe by more than 50%, while still delivering power-savings and compact system design. In its more than ten years of pioneering innovative technologies, Transmeta has invested over $500 million in research and development. (Horsley ¶¶ 18-19, 27, 33).

B.     **Transmeta's Patent Portfolio**

As Intel correctly observes (D.I. 39 at 1, n.1), the eleven Transmeta patents in suit are in four separate "families." The "Speculative Address Translation family" consists of U.S. Patents Nos. 5,895,503; 6,226,733; 6,430,668 and 6,813,699. The "Instruction Scheduling family" consists of U.S. Patents Nos. 5,737,624; 5,974,526 and 6,289,433. The "Multiple Typed Register family" consists of U.S. Patents Nos. 5,493,687; 5,838,986 and 6,044,449. The fourth family consists of one patent, U.S. Patent No. 7,100,061 ("the '061 patent"), and relates to adaptive power control. (Beamer ¶ 4).

Within each of the three families that include multiple patents, the specifications of the patents are substantively identical. All of the patents in a given family have the benefit of the same priority date. For each patent family, the same Intel product families of microprocessors are accused of infringement, and Intel relied on the same principal prior art references for its invalidity contentions. (Beamer ¶ 6).

1.     **The '061 Patent**

The '061 invention was conceived in the late 1990's, while Transmeta's engineers were developing the LongRun power-saving technology of Transmeta's Crusoe microprocessor. The '061 invention was a fundamental advance on microprocessor power consumption, significantly increasing the battery life of notebook computers. (Horsley ¶ 9).

Indeed, Intel was beginning to realize at that time that its Pentium microprocessor had a major problem on this score. According to Intel itself, if its power-hungry approach to processor design continued, future generations of processors would be hotter than the core of a nuclear reactor. (Beamer ¶ 7, Exh. 1). After Transmeta introduced it, Intel adopted Transmeta's '061 patent technology in its Pentium-M and subsequent microprocessors. Using Transmeta's

'061 inventions, Intel was able to reduce power consumption and heat generation, thereby increasing battery life in notebook computers.

### 2. The Speculative Address Translation Patents

To build upon its technology base, in January 2001, Transmeta acquired the first of the "Speculative Address Translation" patents, and the rights to their continuations, from inventor Richard Belgard, a widely-recognized authority on microprocessor technology. (Horsley ¶ 21; Belgard ¶ 17). Mr. Belgard had conceived of the inventions of these patents in the early 1990's, after he read about a boast made by Intel's General Counsel to the effect that it was impossible to make an x86 compatible processor without infringing Intel's patents. Inspired by this challenge, Mr. Belgard conceived of a design that not only avoided Intel's patents, but was a significant improvement over Intel's then-current approach. (Belgard ¶¶ 9-12).

Mr. Belgard's patents are directed to microprocessor technology that provides a faster memory reference that is compatible with traditional two-step operations (i.e., such as those used in the early x86 Intel microprocessors using both segmentation and independent paging). Intel uses these patents in its Pentium 4 microprocessors.

### 3. The Instruction Scheduling and Multiple Typed Register Patents

In May 2001, Transmeta and Seiko Epson entered into a cooperation agreement in which the two companies would collaborate and share information about their energy-saving technologies in an effort to co-develop low-power microprocessors. As part of that agreement, Transmeta acquired from Seiko Epson the then-issued "Instruction Scheduling" and "Multiple Typed Register" patents, and the rights to their continuations. (Horsley ¶ 23).

These patents arose from a major microprocessor development effort, called Project Seabird, by SMOS Systems, a U.S. affiliate of Seiko Epson. Started in 1988, the goal of Project Seabird was to develop an x86 compatible processor to compete with Intel. SMOS

successfully designed, developed, built and tested its chip, but ultimately concluded that it could not effectively compete with giant Intel.  Project Seabird thus was phased out in 1992.  (Nguyen ¶¶ 3-6).  Seiko Epson obtained a number of patents in the course of this project, however, including the Instruction Scheduling and Multiple Typed Register patent families in suit here.

The Instruction Scheduling patent family is directed towards systems and methods of executing instructions out-of-order using a register renaming technique.  The systems and methods include techniques for identifying data dependencies between multiple instructions and resolving the dependencies through the use of tags.  The Multiple Typed Register patent family is directed towards a register system for a microprocessor comprising an integer register set and a re-typable register set.  The re-typable register set includes a plurality of registers capable of storing and retrieving integer data and floating point data, as specified by an instruction field.

C.    **Transmeta's Licensees**

Transmeta diversified in 2003, and began licensing its intellectual property and semiconductor technologies**.**  Since March 2004, it has granted licenses for its power-saving technologies to NEC Electronics, Fujitsu Limited, Sony Corporation and Toshiba Corporation.  (Horsley ¶ 34).  From May 2005 through March 2007, Transmeta retained a fully integrated microprocessor development team of approximately 160 employees, and continued advanced microprocessor development work, including working on a proprietary microprocessor design project for Sony.  During that time, Transmeta entered into two significant strategic alliance agreements with Sony and Microsoft to develop technologies and provide engineering services.  (Horsley ¶ 35).

In July 2007, NEC Electronics, the first company to license Transmeta's advanced power management and leakage control technologies, announced that it will use Transmeta's technologies in its M2 Mobile Phone Chip.  The NEC M2 Mobile Phone Chip is the

first licensed commercial product to implement Transmeta's advanced power management technologies. (Crudele ¶ 6).

### D.    This Motion Is Part Of Intel's Years-Long Effort To Fend Off Transmeta

Transmeta has been threatened by Intel throughout its entire existence. First, Intel used market tactics to throttle Transmeta's promising technology. ██████████

████████████████████████████████████████████████████████████

████████████████████████████████████ Transmeta sought its remedy in this Court, only to be faced with Intel's latest tactic: a stay that would tie up the action for years.

### 1.    Transmeta's Initial Success Was Stalled By Intel's Market Manipulations

Transmeta's Crusoe product was highly successful at first. It was awarded "Best of Show" at PC Expo in New York City in June 2000, among other accolades. By 2001, Crusoe had been adopted by nearly every major Japanese manufacturer, particularly in compact "ultra-light" notebooks. (Horsley ¶¶ 17, 20).

Intel made every effort, however, to undermine the impact of Transmeta's Crusoe product. A day before Transmeta's announcement of Crusoe and its LongRun technology, Intel introduced its inferior power saving feature called "SpeedStep." Intel then embarked on a crash program in an attempt to match LongRun, and later in 2000 it came out with new lines of low voltage mobile processors specifically targeted for use in laptops. Instead of emphasizing speed, which was Intel's main marketing approach in the past, Intel now emphasized low power usage. It called its low power technology "Enhanced Intel SpeedStep Technology." (Horsley ¶ 28). That technology used Transmeta's patented '061/LongRun technology.

Intel viewed Transmeta as a real competitive threat that it needed to extinguish.

████████████████████████████████████████████████████████████



Intel resorted to a number of business tactics to cut off Transmeta's deals with its Japanese customers who were crucial to Transmeta's credibility in the marketplace, and accounted for the bulk of Transmeta's revenue.  (Horsley ¶ 20).  These tactics included direct payments to computer manufacturers in return for exclusivity; discriminatory rebates, discounts and subsidies conditioned on customer "loyalty"; and threats of economic retaliation against those who gave too much of their business to Transmeta.  As a result, Transmeta's initially promising relationships with the Japanese laptop manufacturers were disrupted.  (Horsley ¶ 29).

These tactics came to the attention of the Japan Fair Trade Commission (JFTC). After so-called "dawn raids" collecting documents, and subsequent enforcement proceedings, on March 8, 2005, the JFTC recommended that Intel be sanctioned for its exclusionary misconduct directed at Transmeta and others.  The JFTC ordered Intel to "cease and desist its conducts [*sic*] which violate Section 3 of the [Japan] Antimonopoly Act."  The JFTC found that Intel "made the five major Japanese OEMs refrain from adopting competitors' CPUs" by offering discounts or

rebates to deal exclusively with Intel.  Intel did not contest the charges.[5]  Unfortunately, that

Order came too late to undo the damage Intel had done.  (Horsley ¶¶ 30-33; Horsley Exhs. 8-10).

2.    ████████████████████████████████████
      ██████████████████████████████████

In August 2002, David M. Simon, Intel's Director of Intellectual Property,

contacted Transmeta's General Counsel to inquire about Transmeta's patent portfolio, including

the patents-in-suit that had issued.  Intel expressed interest in a potential license under

Transmeta's patents, and in obtaining access to Transmeta's advanced technologies.  Mr. Simon

stressed that Intel wished to avoid litigation, and that a suit by Transmeta would scuttle any

technology licensing or collaboration agreements.  (Horsley ¶ 25).

████████████████████████████████

██████████████████████████████

█████████████████████████████████

████████████████████████████████████

█████████████████████████████████████

██████████████████████████████████████

████████████████████████████████████

██████████████████████████████████

█████████

---

[5]    The European Commission also sent a "Statement of Objections" to Intel on July 26, 2007, accusing it of anticompetitive conduct against AMD in Europe that is essentially the same as that targeted against Transmeta in Japan, such as providing substantial rebates to various Original Equipment Manufacturers conditional on them obtaining all or the great majority of their CPU requirements from Intel.  (Beamer Exh. 8).



### 3.    A Stay Would Severely Threaten Transmeta's Chances For Survival

By 2005, Transmeta concluded that it could not compete head-to-head with Intel in the microprocessor product business. Transmeta thus shifted its focus to the development and licensing of its advanced technology, and discontinued its Crusoe and Efficeon microprocessor product lines. Transmeta's discontinuation of its product lines forced it to drastically reduce its workforce. Transmeta had 440 employees in 2001, but by the end of 2005, its workforce was down to 221 employees. (Horsley ¶¶ 33, 35; Crudele ¶ 4).

This year, Transmeta was forced to further downsize its operations in light of its remaining liquid assets. Transmeta now has approximately 40 employees, ██████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████ Transmeta's current research and development efforts are focused on enhancing both its advanced power management and leakage control technologies. These technologies can diminish the negative effects of increasing leakage power and process variations in advanced nanoscale designs of semiconductor products. Transmeta's advanced technologies offer many prospective benefits, including the ability to improve yield distributions and reduce active and standby power consumption in semiconductor devices. (Crudele ¶¶ 5, 8).

Transmeta's primary current management goal is to establish a secure home for this dedicated group of development engineers in order that they can continue to develop Transmeta's pioneering microprocessor, semiconductor and computing technologies for licensing to other companies. Those development efforts have been productive. ████████ ██████████████████████████████████████████████████████ ████████████████ (Crudele ¶ 9).

Transmeta's financial condition has not improved since the April 2007 case management conference before this Court.  In May 2007, Transmeta announced in its quarterly report to the Securities and Exchange Commission that there was substantial doubt about its ability to continue its operations for the next year, and that Transmeta would need to raise additional financing in order to continue its operations through the next twelve months.  (Crudele ¶ 10).

In July 2007, Transmeta received a $7.5 million investment from Advanced Micro Devices ("AMD") to support Transmeta's development work and AMD's efforts to leverage Transmeta's innovative energy efficiency technologies.  (Crudele ¶ 11).  Despite that, Transmeta is still in a vulnerable financial position and does not have sufficient financial resources and anticipated revenues to fund its development operations for the next 12 months. Transmeta most recent quarterly report with the SEC again reported that there is still substantial doubt regarding Transmeta's ability to continue its operations as a going concern without raising additional financing through outside investment.  (Crudele ¶ 12).

Transmeta will have substantial difficulty sustaining a viable technology development and licensing business if its patent rights were to be impaired by a sustained stay of the sort sought in this case by Intel.  (Crudele ¶ 13).  In addition, Transmeta's ability to attract the additional investment capital that it will require to continue its technology development and licensing operations would be severely undercut if this Court were to grant Intel's motion and stay this lawsuit.  (Crudele ¶ 14).

E. **Intel Knew About The Patents In Suit And The Reexamination Prior Art Long Before It Requested The Reexaminations**

Intel knew about the three patent families comprising ten of the eleven patents in suit years prior to suit, but did not file even its first request for reexamination until this year — five months after this action had been filed.

Intel knew of the Speculative Address Translation patent family, ███████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████████████████████████████

███████████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████  In 2001, Transmeta announced that it had acquired rights to patents in Seiko Epson's portfolio, ████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████████████████████████████

███████████████████████████████████  (Horsley ¶¶ 23-26; Horsley Exh. 7).

---

[6]     The parent in the Speculative Address Translation patent family, U.S. Patent 5,895,503, had issued in 1999. The continuation application for the U.S. Patent No. 6,226,733 was pending in late 2000. The remainder of the patent family arose after Transmeta acquired the Speculative Address Translation patent family. (Beamer ¶ 5).

As to the '061 patent, 

(Horsley ¶ 43).

Intel also has long known of most of the prior art on which it relies in its reexamination requests. Of the 41 references relied on, all but 11 were cited during the prosecution of one or more of the patents in suit, are themselves Intel patents or products, and/or were cited years ago during the prosecution of Intel patents in the field. The remaining 11 are cumulative to the others, and/or were used to support invalidity averments only as to specific dependent claim limitations. (Beamer ¶ 17).

**F.       The Reexaminations Will Take Many Years To Complete**

Intel has commenced eight *ex parte* reexaminations and three *inter partes* reexaminations. These proceedings will take many years to complete. Although there are statutory and regulatory provisions to the effect that these proceedings are supposed to be conducted "with special dispatch," 35 U.S.C. § § 305, 314(c), in fact, there are no real deadlines imposed on examiners' actions after the first office action. Notwithstanding the avowed policies, the harsh reality of limited resources and huge backlog means that examiners and other Patent Office functionaries often take months or even years to take necessary actions. Only the patent owner or, in the case of *inter partes* reexaminations, the requester, have continuing actual deadlines to respond to Patent Office actions. The Patent Office has no such continuing deadlines. And there is no "special dispatch" requirement if the results of the Patent Office's reexamination findings are appealed to the Federal Circuit.

1.      *Ex Parte* Reexamination Proceedings Take Years to Complete

Since 1980, when the *ex parte* reexamination procedure was instituted, 8,774 *ex parte* reexamination requests have been filed, and 5,839 reexaminations have issued.  As of the second quarter of this year, based on cumulative statistics that the Patent Office provides, the average pendency of all *ex parte* reexaminations that have been completed has been 23.4 months. (Beamer ¶ 19).

These statistics are overly optimistic, however.  Taking a more relevant, recent sample of 1000 *ex parte* reexaminations commenced between July 2003 and August 2005:  637 have issued or been noticed to issue, with an average pendency of 27.64 months, and 25% had a pendency greater than 33 months.  Of the 513 still-pending reexaminations brought in this time period, the average pendency so far has been 32.2 months, with 25% pending more than 37 months. The 384 reexamination certificates that have issued in the last year in *ex parte* cases had an average pendency of 33.38 months, with 25% exceeding 39 months.  (Beamer ¶¶ 20-21). Moreover, even these averages are optimistic in that they do not distinguish between truly contested cases and cases amenable to unusually rapid results, where the patent owner defaulted, or where the technology is trivial, or other circumstances not present here.

Thus, it is highly likely that the *ex parte* reexamination proceedings Intel initiated will take three or more years.  Indeed, one commentator has noted that for the more important patents, the average time to completion is "just short of ten years":

> A survey reported in July 2003 determined that "[f]or the upper third of the curve of *confirmed* patents where the PTO (or the courts) *confirmed* that 'claim 1'... should be allowed *without amendment*, the average pendency was fifty-four (54) months or 4.5 *years*."  This statistic took into account *all* patents, including trivial ones allowed on a first action, those that are commercially unimportant to the patentee and so forth.  A sample of cases important enough to reach the Federal Circuit was considered a better indicator of pendency for patents deemed

important by the patentee.  For this sample the average pendency was just short of ten years [115 months - or nine years and 5 months].[7]

The Transmeta patents at issue here are both complex and important.

Significantly, Intel has resorted to filing multiple reexamination requests in the past to drag out reexamination proceedings even longer.  As recently explained by Intel's reexamination counsel:

> [M]ultiple *ex parte* reexaminations can be filed, with the only thing stopping the requester being that no more substantial new questions of patentability exist, or if the requester files an *inter partes* reexamination request.  Therefore, it is often desirable to start filing *ex parte* reexamination requests early and often, and then finish with the filing of an *inter partes* reexamination request.[8]

Intel's reexamination counsel further explained that reexamination "opens up a new front in the case that can create additional levels of uncertainty for the plaintiff-patentee in terms of time to trial . . ."[9]

An example of Intel's exploitation of this tactic to delay proceedings involved one of its competitors — Cyrix Corporation — which sold x86 compatible microprocessors in competition with Intel.  Cyrix applied for a broadening reissue of one of its patents directed to a feature of Intel's Pentium chip.  After Intel was notified of the reissue, it bombarded the Patent

---

[7]     Wegner, *Thirty-Four (Plus) Patent Topics Of Current Interest*, p. 10 (Beamer Exh. 16). *See, e.g.*, *In re Am. Acad. of Sci. Tech. Ctr.*, 367 F.3d 1359 (Fed. Cir. 2004) (PTO's findings were not confirmed until ten years after a reexamination was first requested).

[8]     McCombs, et al., "The New Role Of Reexamination In Patent Litigation," 2006 *Advanced Patent Law Institute* (November 16-17, 2006), p. 29. (Beamer Exh. 17).  Also, Shang, et al., "*Inter Partes* Reexamination of Patents: An Empirical Evaluation," *Texas Intellectual Property Law Journal*, Vol. 15:1 (Feb. 2007), p. 5, n. 25 (Beamer Exh. 18):

> The requester can try to improve its participation by filing another ex parte reexamination request for the same patent in the midst of the first reexamination proceeding.

[9]     McCombs, et al., at 1.  (Beamer Exh. 17).

Office with repetitive protests, petitions and a reexamination request that delayed the reissue of Cyrix's patent for over 13 years.  (Beamer ¶ 33).

### 2. *Inter Partes* **Reexaminations Are Seriously Backlogged**

As bad as the situation is for *ex parte* reexaminations, it appears to be even worse for *inter partes* proceedings.  This stands to reason, because a semblance of the advocacy process is introduced in these proceedings, although without the rigors and skills present in an Article III court (which Intel seeks to avoid).

Since 1999, when the *inter partes* reexamination procedure was instituted, there have been 280 *inter partes* reexamination applications submitted.  ***Only nine reexamination certificates have issued,*** however.  And of the nine issued certificates, four were ***defaults***, prematurely terminated for failure to timely respond.  (Beamer ¶ 24).[10]

Intel's trial counsel has acknowledged that "we have limited data points to understand how fast these [*inter partes* reexamination] processes are going to go forward... I think our ability to predict over the next year and a half or two years how quickly those processes may go is limited." (D.I. 26 at 26).  Although there are no reliable statistics as to the substantive outcome of *inter partes* reexaminations, it is abundantly clear that the procedure is mired in delay.  To date, the average pendency of all issued *inter partes* reexaminations has been 31.3 months — with no end in sight.  Not counting the default cases, the average pendency has been 37 months.  One reexamination took 50 months.  Of the 254 *inter partes* reexaminations still pending, 86 were commenced two years ago or more, with an average pendency so far of 36

---

[10]    The default reexaminations were 95/000,004; 95/000,037; 95/000,041 and 95/000,095.  In addition, five reexaminations have a "notice of intent" indicating that a certificate will issue.  Of the five notices of intent, three were defaults (95/000,117; 95/000,131; 95/000,176).  (Beamer ¶ 25).

months, and 25% exceeding 43 months pendency. (Beamer ¶ 26). According to a lawyer at Intel's law firm:[11]

> [S]ince it typically takes at least two years to complete a reexamination (with three or more years being likely), it would not be surprising for trial to complete before reexamination.

To like effect:[12]

> From this data, it's apparent that *inter partes* cases move more slowly after the initial office action, and that it may take years for the examiner to issue a final order.

## ARGUMENT

"The decision to grant or deny a stay is within the court's broad range of discretionary powers." *Cognex Corp. v. Nat'l Instruments Corp.*, C.A. No. 00-442 (JJF), 2001 U.S. Dist. LEXIS 25555, at *3 (D. Del. June 29, 2001). There is nothing inappropriate about a court allowing the litigation to proceed concurrently with a reexamination. *Ethicon, Inc. v. Quigg*, 849 F.2d 1422, 1426 (Fed. Cir. 1988); *Viskase Corp. v. Am. Nat'l Can Co.*, 261 F.3d 1316, 1328 (Fed. Cir. 2001) (affirming denial of stay).

When deciding whether to exercise that discretion, this Court considers: "'(1) whether a stay would unduly prejudice or present a clear tactical disadvantage to the non-moving party; (2) whether a stay will simplify the issues in question and trial of the case; and (3) whether discovery is complete and whether a trial date has been set.'" *Abbott Diabetes Care, Inc. v. Dexcom, Inc.*, C.A. No. 05-590, 2006 WL 2375035, at *5 (D. Del. Aug. 16, 2006). "[T]he court should 'weigh the competing interests of the parties and attempt to maintain an even balance.'"

---

[11]    Shang, et al., p. 23 (Beamer Exh. 18).

[12]    Cohen, What's Really Happening in Inter Partes Reexamination (Beamer Exh. 19).

*Cognex Corp,* 2001 U.S. Dist. LEXIS, at *3.  Balancing those factors here demonstrates that this case should go forward without delay.

> **A.    A Lengthy Stay Would Unduly Prejudice Transmeta — Transmeta's Very Survival Is At Stake**

> **1.    Undue Prejudice Is The Most Important Factor To Be Considered**

Applicable Supreme Court authority elevates "undue prejudice" as the most important factor to be considered.  If undue prejudice is a "fair possibility," there are strict limits on a Court's power to stay litigation pending other proceedings.

In confirming that a district court has the power to stay litigation pending reexamination, the Federal Circuit in *Ethicon* relied upon, as the source of that power, the Supreme Court's decision in *Landis*, 849 F.2d at 1426-27.  There, Justice Cardozo placed severe constraints on the power of a Court to stay pending the outcome of some other proceeding (299 U.S. at 254-55) (emphasis added):

> [T]he power to stay proceedings is incidental to the power inherent in every court to control the disposition of the causes on its docket with economy of time and effort for itself, for counsel, and for litigants.  How this can best be done calls for the exercise of judgment, which must weigh competing interests and maintain an even balance....  True, ***the suppliant for a stay must make out a clear case of hardship or inequity in being required to go forward, if there is even a fair possibility that the stay for which he prays will work damage to some one else***.

Although the Court held that an individual "may be required to submit to delay... if the public welfare or convenience will thereby be promoted," the delay should "***not [be] immoderate in extent and not oppressive in its consequences***."  299 U.S. at 256.

Intel does not address *Landis* at all in its brief, notwithstanding that it is controlling here.[13]  The stay Intel seeks here would be immoderate in extent and would be

---

[13]    Numerous District Court opinions have applied the Landis standard as a key basis for denying stays pending Patent Office proceedings.  *Cognex Corp.,* 2001 U.S. Dist. LEXIS

(Continued . . .)

extremely oppressive in its consequences. Indeed, it would threaten Transmeta's existence as a

viable enterprise. This is "undue prejudice" that requires denial of a stay. Therefore, Intel must

show a "clear case of hardship or inequity" absent a stay. Intel cannot make such a showing.

The hardship and prejudice is all one way — falling on Transmeta.

### 2.    The Reexamination Proceedings Are Likely To Entail Significant Delay

Courts that have focused on the lengthy delay inherent in reexaminations have

consistently found undue prejudice resulting from that delay. For example, in *Remington Arms*

*Co. v. Modern Muzzleloading, Inc.*, No. 97-0660, 1998 WL 1037920, at *2-3 (M.D.N.C. Dec.

17,1998), the court declined to stay because the long delay would prejudice plaintiff:

> [A] stay for reexamination could last for years... [a]fter such a passage of time,
> [the lawsuit] may no longer have value as technology or market conditions
> change.

Likewise, in *NTP, Inc. v. Research in Motion, Ltd.*, 397 F. Supp. 2d 785, 788

(E.D. Va. 2005), the court denied a stay pending reexamination, stating:

> Reality and past experience dictate that several years might very well pass from
> the time when a final office action is issued by the PTO to when the claims are
> finally and officially "confirmed" after appeals.
>
> *    *    *
>
> [A]ny attempt at suggesting a likely time frame and outcome of the PTO
> reexamination process is merely speculation. This Court cannot and will not
> grant...the extraordinary remedy of delaying these proceedings...based on
> conjecture.

---

(. . . continued)
> at *4; *Unidisco, Inc. v. Schattner*, 210 U.S.P.Q. 622, 629-30 (D. Md. 1981); *Imax Corp.*
> *v. In-Three, Inc.*, 385 F. Supp. 2d 1030, 1032 (C.D. Cal. 2005); *St.-Gobain Performance*
> *Plastics Corp. v. Advanced Flexible Composites, Inc.*, 436 F. Supp. 2d 252, 253 (D.
> Mass. 2006); *Amersham Int'l v. Corning Glass Works*, 108 F.R.D. 71, 72 (D. Mass
> 1985); *Akzenta Paneele + Profile GmbH v. Unilin Flooring N.C. LLC*, 464 F. Supp. 2d
> 481, 484 (D. Md. 2006); *Output Tech. Corp. v. Dataproducts Corp.*, 22 U.S.P.Q.2d 1072,
> 1074 (W.D. Wash. 1991).

Contrary to *Intel's* conclusory assertion that "the stay should not be unduly long" (D.I. 39 at 17), the most recent PTO data shows that the median pendency for consideration of a request for *ex parte* reexamination is between 27 and 33 months.  For *inter partes* reexaminations proceedings, it is clear that proceedings are mired in delay, with average delays of more than 37 months.  The reexamination decisions may further be appealed to the PTO Board of Patent Appeals and Interferences, and then to the United States Courts of Appeals for the Federal Circuit.  *See* 35 U.S.C. § 315 (2007).  Consequently, "several [additional] years might very well pass from the time when a final office action is issued by the PTO to when the claims are finally and officially 'confirmed' after appeals." *NTP,* 397 F. Supp. 2d at 788.  Thus, the total time elapsed during Intel's requested stay could extend for four or five years, enough time to frustrate the very purpose for which for which Transmeta has filed this suit.  (D.I. 26 at 25-26 (The Court acknowledging that "this case would probably proceed to some final conclusion, even in the appellate court" before the outcome in the Patent Office)).

On that basis, alone, courts have routinely denied stays pending reexamination. *See, e.g*., *Cognex,* 2001 U.S. Dist. LEXIS 25555, at *6 ("given the current time tables for action in the PTO, the Court believes that the trial in this case will likely be completed prior to any action by the PTO"); *Output Tech.,* 22 U.S.P.Q.2d at 1074 (plaintiff as a small business will be injured if the trial is delayed, ***"as is likely under even an expedited review by PTO"***) (emphasis added); *Imax*, 385 F. Supp. 2d at 1033 ("the myriad issues in this case that will remain unresolved and unaddressed pending the (potentially) two-year examination justify allowing this case to go forward"); *Amersham*, 108 F.R.D. at 72 ("Plaintiff might therefore be delayed many years before it is allowed to resume its cause of action."); *Xerox Corp. v. 3Com Corp.*, 69 F. Supp. 2d 404, 407 (W.D.N.Y. 1999) (reexamination would involve a "lengthy delay" that "***could***

25

*easily exceed two years*") (emphasis added); *Alltech, Inc. v. Cenzone Tech Inc.*, No. 06-0153, 2007 WL 935516, at *2 (S.D. Cal. Mar. 21, 2007) ("non-moving party may be unduly prejudiced by the lapse of time during reexamination, which could result in loss of evidence and the fading of witness memory"); *Biax Corp. v. Fujitsu Computer Sys. Corp.*, No. 06-364, 2007 WL 614187, at *2 (E.D. Tex. Feb. 26, 2007) ("potential delay for an indefinite period would likely prejudice [patentee]"); *Lexington Lasercomb I.P.A.G. v. GMR Prods., Inc.*, 442 F. Supp. 2d 1277, 1277 (S.D. Fla. 2006) ("[A] stay of this action could result in a delay of months, if not years. Accordingly, this Court declines to stay, and thus prolong for an indefinite period of time, the instant litigation.").

Indeed, in *Microunity Sys. Eng'g, Inc. v. Dell, Inc.*, No. 02-04-120, slip op. at 4 (E.D. Tex. Aug. 15, 2005) (Beamer Exh. 20), the Court denied Intel's motion to stay on this very basis. There, as here, Intel moved to stay after commencing *ex parte* and *inter partes* reexaminations of all the patents in suit. The Court denied Intel's motion, stating:

> Due to the inherent delay in reexamination proceedings, the opportunities for numerous appeals, and the apparent conflict between the parties, it appears likely that if a stay were granted, it could take more than four to five years before this case would be back before this Court.

*Id.* Notably, after the stay was denied, Intel settled that litigation. But the **reexaminations in that case continue to this day with no end in sight**.

Here, there can be little doubt that Intel's motion, which seeks to stay this action until all eight *ex parte* and three *inter partes* reexaminations are completed, will last for many years. The delay alone here constitutes undue prejudice because it may result in a win for Intel, not on the merits but by default. Intel should not be permitted to "unilaterally derail timely patent case resolution by seeking reexamination." *Soverain Software LLC v. Amazon.com*, 356 F. Supp. 2d 660, 662-63 (E.D. Tex. 2005).

### 3.     The Likely Delay Would Threaten Transmeta's Very Existence

In addition to the inherent prejudice Transmeta would suffer as a result of such a lengthy delay due to lost evidence, fading memories and the like, Transmeta faces the much more tangible risk of actually going out of existence if a stay is imposed, because obtaining the necessary new funding it needs to continue would be jeopardized.

As discussed above, today Transmeta has approximately 40 employees, ███████ ████████████████████████ supporting Transmeta's current research and development efforts. Transmeta's goal is to preserve a secure home for this dedicated group of valuable employees. (Crudele ¶¶ 8-9). However, Transmeta has announced to its shareholders that its ability to continue as a going concern hinges on raising additional investment funds. (Crudele ¶ 12). An indefinite stay of this action would cripple Transmeta's ability to attract the additional investment capital that it will require to continue its technology development and licensing operations. (Crudele ¶¶ 13-14).

### B.     Intel Filed This Motion Solely For Tactical Advantage

Intel has not "proceeded expeditiously with its requests for reexamination" (D.I. 39 at 5), as it urges, but has leveraged its reexamination requests to place Transmeta at a tactical disadvantage and to delay resolution of this matter, likely for years. Intel was aware of Transmeta's patent portfolio long before this lawsuit was filed. It could have filed six of its requests as to the then-issued patents in 2001 when it learned ███████████████████ ████████████████████████████.[14] It could have filed all but two of

---

[14]     As of 2001, U.S. Patent No. 5,895,503 of the Speculative Address Translation family had issued, U.S. Patent Nos. 5, 493,687, 5,838,986 and 6,044,449 of the Multiple Typed Register family had issued; and U.S. Patent Nos. 5,737,624 and 5,974,526 of the Instruction Scheduling family had issued. (Beamer ¶ 5).

its requests in 2002, when it first expressed interest in licensing Transmeta's patent portfolio.  It could have filed all but one of its requests in January 2005, ████████████████████ ████████████████████████████████████  It could have filed all of its requests in October 2006, when it was sued by Transmeta.  Intel choose not to take any of these opportunities.

This inexcusable delay in seeking reexamination militates against a stay, giving rise to the inference that the motion is primarily a delaying tactic.  In *Lectrolarm Custom Servs., Inc. v. Vicon Indus., Inc.*, No. 03-2330, 2005 WL 2175436, at *5 (W.D. Tenn. Sept. 1, 2005), where defendants waited five years to request reexamination after learning of the prior art, the Court held:

> The easier course for the court would be to stay the action.  That, however, would reward the Defendants' unexplained, and seemingly unexplainable, delay in filing the reexamination request.

*See also Cognex,* 2001 U.S. Dist. LEXIS 25555 at *6-7 (stay denied, in part, because movant delayed ten months in requesting reexamination); *Remington Arms*, 1998 WL 1037920, *2-3 (stay denied because of defendant's "unjustified delay" of three months in requesting reexamination); *Xerox*, 69 F. Supp. 2d at 406-07 ("dilatory tactical motive" because reexamination references were known eight months before request); *Alltech,* 2007 WL 935516, at *4 (denying stay where movant waited for a month after confirming prior art before requesting reexamination and then waited another month before filing the motion to stay).

Here, too, Intel's delay exposes the real purpose of its motion.  Intel has known for years about the patent families comprising ten of the eleven patents-in-suit, and of the bulk of the prior art that it relies on, yet waited five months after suit commenced to start its reexamination requests, and three more months to bring this motion.

**C.     Proceeding With This Litigation Would Not Waste The Court's Resources, And A Stay Would Not Significantly Simplify The Issues**

The next factor that courts consider, whether a stay "will simplify the issues in question and trial of the case," also does not support a stay.  Intel argues that the Court's and the parties' resources would be wasted if the Court does not grant its motion to stay (D.I. 39 at 4, 13).  Of course, any motion to stay one proceeding in favor of another is premised on the theoretical possibility that the outcome of the latter proceeding will make the former proceeding unnecessary, or eliminate issues.  When presented with this argument in *Landis*, however, the Supreme Court held that such invocations to expedience paled in the face of even a "fair possibility" of undue prejudice, or if the stay would be immoderate in length.

Intel's argument that the reexamination would simplify or eliminate the issues based on the facts here is fundamentally flawed for two reasons.  First, it is highly unlikely that the reexaminations will dispose of, or significantly limit, the issues presented in this litigation. Second, it is likely that this litigation will be completed before the final results of the reexaminations are known.

**1.     It Is Unlikely That The Reexaminations Will Significantly Simplify This Case**

Statistically, it is highly likely that at least some claims of each of the patent families in suit, in original or amended form, will emerge from the reexaminations.  For *ex parte* reexaminations, 90% of reexamination certificates issued with at least one original or amended claim in force.  (*Inter partes* reexamination certificates are too few for reliable statistics.)[15]

---

[15]     (Beamer ¶ 27).  Contrary to Intel's suggestion (D.I. 39 at 1, 11), the fact that the Patent Office has granted several of the reexamination requests that Intel has submitted, and found "substantial new questions of patentability," is not a relevant indicator that issues will be simplified.  To date, 92% of all *ex parte* reexamination requests, and 96% of all *inter partes* reexamination requests, have been granted (Beamer ¶ 28).  Thus, "the grant

(Continued . . .)

Given the high likelihood that at least some claims in each patent family will issue from reexamination, this case if resumed after stay would not be significantly simpler than this case if expeditiously tried. Although Intel asserts that reexamination may reduce the number of claims, in the normal course of a case, the number of asserted claims is reduced, and the parties' infringement and invalidity positions are streamlined to try the case to the jury in the time allotted. Moreover, contrary to Intel's assertions (D.I. 39 at 12), merely reducing the number of claims does not necessarily reduce complexity proportionately. There is significant overlap among the claim construction issues, infringement issues, and invalidity issues for the claims of a patent family. Whether one claim or ten claims are asserted in a given family, they will involve the same underlying patent specification and file histories, the same accused products, the same principal prior art, and the same underlying technology which will have to be presented to the Court and jury. Many of Intel's present invalidity claims will not even be addressed in the reexaminations, because only printed publications and patents can be considered. (Beamer Exh. 22); *Lectrolarm*, 2005 WL 2175436 at *3 ("Further, reexamination only deals with invalidity from printed prior art. Unless all claims were invalidated…this court would still need to deal with issues concerning other types of prior art, liability, and damages."). And ***none*** of the many other issues of a patent litigation are considered. Thus, no significant simplification would be accomplished by a stay — only prejudicial delay.

Intel complains that certain inefficiencies that would result absent a stay, suggesting that claim construction proceedings, depositions, expert reports, summary judgment motions would have to be redone after the reexamination results are finalized (D.I. 39 at 4).

---

(. . . continued)
by the examiner of a request for reexamination is not probative of unpatentability." *See also, Hoechst Celanese Corp. v. BP Chems. Ltd.*, 78 F.3d 1575, 1584 (Fed. Cir. 1996).

First, as discussed below, it is unlikely that the reexaminations would be completed before trial, if this case goes forward.  But even if a reexamination is finalized with amended claims issuing from the reexamination, it is unlikely that much will have to be redone.  Any amended claims that issue from reexamination can only include additional claim elements; no claim element can be dropped.[16]  Thus, if a narrowing amendment issues before trial, at most some supplemental discovery may have to be taken as to an additional claim element that has been added to the case (assuming the added element was not already considered as part of another existing claim).

To the extent there may be some inefficiencies, they are to be expected, given that "litigation and reexamination are distinct proceedings, with distinct parties, purposes, procedures, and outcomes."  *Ethicon*, 849 F.2d at 1427 (citations omitted).  Indeed, while "prior to trial, the PTO may issue rulings that will need to be considered, thus causing some inefficiencies in the pretrial and trial process . . . such inefficiencies are an inherent byproduct of concurrent litigation and reexamination and, therefore, do not constitute exceptional circumstances justifying a stay."  *ArthroCare Corp. v. Smith & Nephew, Inc.*, No. 01-504, slip op. at 2 (D. Del. Nov. 27, 2002).  (Beamer Exh. 21).

Courts that take these realities into account have concluded, for example:

> [I]t is ... likely that some claims and issues will remain after the reexamination has been completed.  Accordingly, waiting for the completion of the reexamination may only simplify the case to a limited degree.  This factor is speculative and does not support a stay.

---

[16]    35 U.S.C. §§ 305, 314(a); *Quantum Corp. v. Rodime, PLC*, 65 F.3d 1677 (Fed. Cir. 1995).  For example: If claim 1 presently has elements A, B, and C, amended claim 1 could have elements A, B, C and D.  After such an amendment, elements A, B, and C would still need to be construed and compared to the prior art and the infringing devices. In addition, those tasks would also have to be performed for new element D.

*PureChoice, Inc. v. Honeywell Int'l, Inc.*, No. 06-244, 2007 WL 1189844, at *1 (E.D. Tex. April

20, 2007). And in *Akzenta*, 464 F. Supp. 2d at 486, the Court held:

> It is more likely, however, that the claims will not be totally cancelled, given the
> statistics cited above. As a result, even after reexamination, invalidity will
> continue to be an issue so a stay would not preserve many resources.
> Accordingly, this factor does not weigh heavily in favor of or against granting a
> stay.

*See also Soverain Software,* 356 F. Supp. 2d at 663 ("Some of the claims may change . . . the

interests of justice will be better served by dealing with that contingency when and if it occurs,

rather than putting this case indefinitely on hold.").

      Intel also argues that, with respect to claims that issue from a reexamination

proceeding, the arguments made by the parties, and the findings of the examiner, will be

instructive to the Court. There are a number of reasons why this argument does not justify a stay

in this case. First, such a scenario is not significantly different from any other patent case where

the jury is presented with a patent that the Patent Office has allowed to issue. As this Court has

observed, if a claim is sustained on reexamination, the jurors will still "Monday-morning-

quarterback ... the experts in the PTO" (D.I. 26 at 22). As another court observed, "[w]hile it is

fully cognizant of the PTO's expertise, the Court is confident that the parties themselves will be

able to effectively present their case on validity to the jury for decision, with or without the

record of the PTO's re-examination." *Ecolab, Inc. v. FMC Corp.*, No. 05-831, 2007 WL

1582677, *2 (D. Minn. May 30, 2007).

      In addition, the applicability of the Patent Office proceedings to this case are

constrained by the significant differences between the two proceedings. The claim construction

standards applied by the Patent Office are different than those applied by the district court

because during reexamination claims are given the broadest reasonable interpretation consistent

with the specification and limitations in the specification are not read into the claims.[17]  The

statutory presumption of validity, 35 U.S.C. § 282, does not apply in reexamination, and as noted

above, the Patent Office considers only prior art patents and publications.[18]  Furthermore,

reexamination proceedings are no longer assigned according to the technology of the patent, but

are conducted by a group of examiners who specialize in "reexamination practice and relevant

case law."  (Beamer Exh. 23).  Thus reexaminations no longer yield an expert technical analysis

so much as an alternative adjudicative review on the papers — hardly of much benefit to this

Court.

Intel also argues that a stay will allow the reexamination process to create more

intrinsic evidence that could be factored into claim construction (D.I. 39 at 5, 14-15).  Such a

fishing expedition for admissions against interest is unlikely to yield results.[19]  In any event, the

possibility of eliciting inadvertent admissions against interest is hardly a sensible or just reason

to stay this case for years.

### 2.    This Litigation Will Likely Be Completed Before The Reexaminations

As demonstrated *supra*, if this case is not stayed, it is likely that trial will take

place, and final judgment will be entered, before the reexaminations are completed.  Intel does

not come to grips with this simple reality.  Given such a sequence of events, there is no

---

[17]    *In re Yamamoto*, 740 F.2d 1569 (Fed. Cir. 1984); *In re Am. Acad. of Sci: Tech Ctr.*, 367 F.3d 1359, 1364 (Fed. Cir. 2004) ("The 'broadest reasonable construction' rule applies to reexaminations as well as initial examinations").

[18]    *In re Etter*, 756 F.2d 852 (Fed. Cir. 1985); *Xerox*, 69 F. Supp. 2d at 407.

[19]    It is unlikely that a patentee in reexamination would surrender coverage of its claims over an accused product that is subject to litigation.  As one of Intel's lawyers observed: "It would be unwise for a patent owner to narrow claims into a scope that does not cover market products; such claims, even if distinguishable over prior art, would be useless to the patent owner." *See* Shang, et al., *supra* at p. 5.  (Beamer Exh. 18).

33

contradiction or wasted effort or any other undesirable consequence that would necessitate, let alone justify, a stay of this action. Final judgment in this action would not be retroactively affected by subsequent final results of reexaminations. If a patent is invalidated in litigation, subsequent reexamination proceedings are rendered moot. In fact, an invalidity judgment terminates a reexamination. *Ethicon*, 849 F.2d at 1429. On the other hand, if Intel does not prove that a patent is invalid, any *inter partes* reexamination of that patent will also be terminated. 35 U.S.C. § 317(b). Although an *ex parte* reexamination may continue in this instance (*Id*. at 1422), any final judgment of damages awarded based on that patent would be unaffected by a subsequent final cancellation of claims in reexamination.

There is nothing untoward about this Court finding a patent not invalid and the Patent Office subsequently finding it invalid. There is no policy that favors avoiding this theoretical result by indefinitely staying the litigation. The Federal Circuit has unequivocally held that, "'litigation and reexamination are distinct proceedings, with distinct parties, purposes, procedures, and outcomes.'" *Ethicon,* 849 F.2d at 1427 (citation omitted). The Federal Circuit further held in *Ethicon* (*id.* at 1428-29):

> [C]hallenging validity in a court and requesting PTO reexamination "are concepts not in conflict." .... The awkwardness presumed to result if the PTO and court reached different conclusions is more apparent than real. The two forums take different approaches in determining invalidity and on the same evidence could quite correctly come to different conclusions.... [D]ifferent results between the two forums may be entirely reasonable.... [I]f the district court determines a patent is not invalid, the PTO should continue its reexamination because, of course, the two forums have different standards of proof for determining invalidity.

*See also Output Tech.,* 22 U.S.P.Q.2d at 1073-74; *Ecolab,* 2007 WL 1582677, at *3; *Xerox*, 69 F. Supp. 2d at 407-08.

### D.     The Discovery And Trial Schedule Does Not Justify A Stay

In light of the other factors that weigh against a stay, the final factor, "whether discovery is complete and whether a trial date has been set," does not justify a stay.  Although discovery has not been completed, it is well underway, and the trial date has been set.  In the face of the prejudice resulting from a lengthy stay, Courts have not hesitated to deny motions to stay at similarly advanced — or even earlier — stages of litigation.  *Output Tech.*, 22 U.S.P.Q.2d at 1074 (denying stay where interrogatories and requests for production were exchanged); *Imax Corp.*, 385 F. Supp. 2d at 1031, 1033 (denying stay motion brought three months after complaint where a trial date was not set and discovery was underway); *Amersham*, 108 F.R.D. at 72 (denying stay where discovery had commenced, thousands of pages of documents had been exchanged, interrogatories were served and depositions had not yet begun); *Telemac Corp. v. Teledigital, Inc.*, 450 F. Supp. 2d 1107, 1109 (N.D. Cal. 2006) (denying stay where responses to interrogatories had been served and documents had been produced); *Cheng v. Sighting Sys. Instruments*, No. 06-2326, 2007 WL 1341119, at *3 (N.D. Ga. May 3, 2007) (denying stay where a trial date was not set and discovery was not complete); *PureChoice*, 2007 WL 1189844, at *1 (denying stay where discovery had just commenced); *Biax*, 2007 WL 614187, at *2 (denying stay where scheduling conference was not yet set and no discovery had been taken).

### E.     There Is No "Strong Public Policy" Or "Liberal Policy" Favoring Stay

Seeking to bypass the strict threshold against imposing a stay established by the Supreme Court in *Landis*, Intel argues that there is a "strong public policy" or "liberal policy" in favor of staying litigation in favor of reexamination.  (D.I. 39 at 2, 4, 10).  Not so.  For this proposition, Intel cites *Pegasus Dev. Corp. v. DirecTV, Inc.*, No. 00-1020, 2003 WL 21105073, at *1 (D. Del. May 14, 2003), where this Court referred to a statement in *Emhart Indus. v. Sankyo Seiki Mfg. Co.*, 3 U.S.P.Q.2d 1889, 1890 (N.D. Ill. 1987): "'in passing the legislation

establishing the reexamination proceeding, Congress stated its approval of district courts liberally granting stays within their discretion.'"  The legislative history on which the *Emhart* court relied, however, does not support that characterization.  Instead, as the Federal Circuit explained in *Gould v. Control Laser Corp.*, 705 F.2d 1340, 1342 (Fed. Cir. 1983), the legislative history merely notes that early versions of the reexamination statute provided for express stays of court proceedings, but that provision was removed.  The legislative history demonstrates that an express provision for stays was deemed unnecessary because courts already have the inherent power to stay proceedings.[20]  Thus, the reexamination statute does not modify in any way the policy considerations of *Landis*.[21]

Moreover, the legislative history of the *ex parte* reexamination statute reveals that Congress's primary concern was to allow the ***patent holder*** the option of pursuing reexamination instead of litigation (H.R. Rep. No. 96-1307(I) (1980), *reprinted in* 1980 U.S.C.C.A.N. 6460, 6462-63, 1980 WL 12929, *3-*4) (Beamer Exh. 24):

> The cost incurred in defensive patent litigation sometimes reaches $250,000 for each party, an impossible burden for many smaller firms.  The result is a chilling effect on those businesses and independent inventors who have repeatedly demonstrated their ability to successfully innovate and develop new products.  ***A new patent reexamination procedure is needed to permit the owner of a patent to have the validity of his patent tested in the patent office where the most expert***

---

[20]   The Federal Circuit relied on H.R. Rep. No. 96-1307(I), (1980), *reprinted in* 1980 U.S.C.C.A.N. 6460, 6463, 1980 WL 12929, at *4 (see Beamer Exh. 24).

[21]   Intel also cites *Guthy-Renker Fitness, LLC v. Icon Health & Fitness, Inc.,* 48 U.S.P.Q.2d 1058, 1060 (C.D. Cal. July 15, 1998), for the same liberal policy proposition.  (D.I. 39 at 10).  *Guthy-Renker* relies solely on *ASCII Corp. v. STD Entm't USA, Inc.*, 844 F. Supp. 1378, 1381 (N.D. Cal. 1994), for this proposition.  The Court in *ASCII* did not cite any authority for its "liberal policy" statement.  More important, the circumstances of *ASCII* are inapplicable to those here.  In *ASCII*, shortly after the complaint was filed, the accused infringer informed the patentee of prior art that allegedly invalidated the patent.  The ***plaintiff-patentee*** wanted to seek reexamination of the patent in light of that art, and moved to stay the litigation pending reexamination.  It is in this totally different context that the Court in *ASCII* referred to a "liberal policy" in granting stays.

***opinions exist and at a much reduced cost.***  Patent office reexamination will greatly reduce, if not end, the threat of legal costs being used to "blackmail" such holders into allowing patent infringements or being forced to license their patents for nominal fees.

The reexamination of issued patents could be conducted with a fraction of the time and cost of formal legal proceedings and would help restore confidence in the effectiveness of our patent system.[22]

Similarly, the legislative history relating to the *inter partes* reexamination statute also demonstrates that Congress intended to create an ***alternative*** to patent litigation, not a way to stop active litigation at the alleged infringer's whim.  The purpose of the *inter partes* reexamination statute is to encourage parties who are confronted by patent owners to challenge validity in a reexamination proceeding in which they can participate ***before*** the confrontation results in judicial proceedings.  Indeed, as the House Report indicates, the major concern was that "[a]n individual or company that wishes to test the validity of an issued U.S. patent that is believed to be too broad in scope has no effective alternative ***to simply waiting*** and challenging the patent in an expensive district court proceeding."[23]

In addition, the *inter partes* reexamination statute provides only that "***the patent owner*** may obtain a stay of any pending litigation which involves an issue of patentability of any claims of the patent which are the subject of the inter parties reexamination order, unless the court before which such litigation is pending determines that a stay would not serve the interests of justice." 35 U.S.C. § 318 (emphasis added).  Congress made no provision for accused infringers to obtain such a stay of claims asserted against them.

---

[22]    Unfortunately, the goal of Congress to provide for a proceeding that can be conducted at a "fraction of the time" of trials has simply not come to pass, as discussed above.

[23]    H.R. Rep. No. 106-287, at 33 (1999).  (Beamer Exh. 25).

## CONCLUSION

Intel's motion for a stay pending reexamination proceedings should be denied, because it will unduly prejudice Transmeta, it was brought solely for the tactical advantage of delay, it is not likely to simplify the case, discovery is well underway, and trial is scheduled for the end of next year, long before the reexaminations can be completed.

Transmeta deserves its day in court within a reasonable period of time, as this Court has already scheduled, and as patent holders have come to expect in this district. Transmeta is entitled to seek fair compensation from Intel for its patents. Particularly in a field where technological innovations come fast and furious, the value of intellectual property must be timely protected. Transmeta, a company with a deep commitment to advancing technological innovations, relies on its licensing program and investors to sustain its work. Intel's motion would thwart Transmeta's ability to live out its mission. Indeed, Intel's motion, if granted, would threaten Transmeta's survival.

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

*/s/ Jack B. Blumenfeld (#1014)*

_____

Jack B. Blumenfeld (#1014)
Karen Jacobs Louden (#2881)
Richard J. Bauer (#4828)
jblumenfeld@mnat.com
1201 N. Market Street
Wilmington, DE 19899
(302) 658-9200
   *Attorneys for plaintiff Transmeta Corporation*

OF COUNSEL:
Robert C. Morgan
ROPES & GRAY LLP
1211 Avenue of the Americas
New York, NY 10036-8704
(212) 596-9000

Norman H. Beamer
Gabrielle Higgins
ROPES & GRAY LLP
525 University Avenue
Palo Alto, CA 94301
(650) 617-4000

John O'Hara Horsley
TRANSMETA CORPORATION
3990 Freedom Circle

August 17, 2007
1215113

## CERTIFICATE OF SERVICE

I, the undersigned, hereby certify that on August 20, 2007, I electronically filed the foregoing with the Clerk of the Court using CM/ECF, which will send notification of such filing(s) to the following:

Josy W. Ingersoll

I also certify that copies were caused to be served on August 20, 2007, upon the following in the manner indicated:

### BY HAND

Josy W. Ingersoll
John W. Shaw
YOUNG, CONAWAY, STARGATT & TAYLOR, LLP
The Brandywine Building
1000 West Street, 17th Flr.
Wilmington, DE 19801

### BY EMAIL

Steven S. Cherensky
Jessica L. Davis
WEIL, GOTSHAL & MANGES LLP
201 Redwood Shores Parkway
Redwood Shores, CA 94065

/s/ Richard J. Bauer (#4828)
_____
Richard J. Bauer (#4828)